Joseph Davis *vs.* The State of Maryland.

*Evidence—Inadmissibility of Medical books in Evidence to sustain
or contradict the opinion of a Witness—Competency of a Witness
as an Expert— When the Opinion of Experts is admissible—
What constitutes a sufficient Foundation for the introduction of
the Opinion of Experts—Irrelevant question—Inadmissibility in
evidence of Rules prescribed by Medical authors—Competency
of an Expert to testify—Practice—Circumstances which do not
affect the competency of a Witness—Incompetency of an Acces-
sory before the fact to Testify for his Principal—Act of 1864,
ch. 109—Introduction of Evidence to support the general char-
acter of a Witness for Veracity—Bills of Exception—Authority
of the Judges in the Courts below under the 5th Rule of the Court
of Appeals, respecting Appeals.*

On a trial for murder, the physician who examined the wounds on the head of
the deceased, and the sink or bin of the mill in which the body was discov-
ered, and also the iron crowbar and adze which were found in or about the
mill, and who fitted the crowbar into the depression in the skull caused by
the fracture, is competent to testify as to the kind of instrument that, in his
opinion, could have inflicted the wounds.

A medical witness on cross-examination by the prisoner's counsel, in a trial
for murder, stated that some books on Medical Jurisprudence distinguished
between such an examination as he had made of the body of the deceased
and autopsy, and designated the former as "an examination of the body;"
and in answer to the question, what book so called it? replied "Taylor."
The counsel for the prisoner thereupon handed Taylor to the witness, and
asked him to refer to that part of the book in which such an examination
was so designated. HELD:

That the statements in the book could not be thus given to the jury.

Medical books are not admissible in evidence, either for the purpose of sustain-
ing or contradicting the opinion of a witness.

In a trial for murder, a witness who stated that he had been a practicing phy-
sician for eighteen years, and had heard the description of the wounds found

on the head of the deceased, as given by the physician who had examined them, and had also heard the description of the sink or bin in which the dead body was found, is competent to testify whether, from the nature of the wound and fracture described by the examining physician as fatal, such wound and fracture could have been, or were likely to have been inflicted by the accidental falling of the deceased into the sink in the condition in which it had been described by the witnesses.

Whenever the matter of inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it; or when it so far partakes of the nature of a science or trade, as to require a previous habit or experience or study, in order to the attainment of a knowledge of it, the opinion of experts is admissible; but if the matter of inquiry be not such as to require any peculiar habits or study, in order to qualify a person to understand it, then such evidence is not admissible.

On a trial for murder, it was shown that the body of the murdered man was discovered in the sink or bin of his mill, with several wounds on the head, one of which involved a fracture of the skull, and that a crowbar found in the mill fitted the depression in the skull, caused by the fracture. HELD:

That these facts were sufficient to lay the foundation for the admissibility of the evidence of medical experts, who from their knowledge and experience in regard to the nature of wounds, were better qualified than ordinary persons to form an opinion as to how and by what means the injuries thus found on the head of the deceased, were inflicted.

In a trial for murder, the enquiry being whether the wound and fracture found on the head of the deceased, and described by the examining physician, were occasioned by his accidentally falling into the sink of his mill, a question to a medical expert as to whether leaving out of view such description of the wound and fracture, the part of the skull below the occipital protuberance, would or would not be liable to be fractured by accident, is irrevalent—it tending in no way to enlighten the jury in regard to the enquiry before them.

In a trial for murder, the prisoner's counsel proposed to ask a medical witness whether it would not have been proper, according to the rules stated by medical authors, and more conducive to certainty in respect to description and location of the wounds and fracture found upon the head of the deceased, that one of the examining physicians should have made notes of the examination of the wounds as they were examined? and whether there were any rules prescribed by medical science for conducting an examination of the body or of the skull, for the purpose of ascertaining an accurate description of the wounds in respect to their character and precise location? and also

whether according to the rules of medical science, notes of the *post mortem* examination ought to have been made at the time of the examination? HELD :

That these questions were inadmissible; the rules prescribed by medical authors could not be offered in evidence.

A medical witness in a trial for murder, who hears the physician who examined the body of the deceased fully describe the wounds on the head and the fracture on the skull, and hears several witnesses describe the construction and condition of the sink in which the body was found, is competent to testify whether such wounds and fracture were likely to have been occasioned by accidentally falling into the sink.

And the fact that he does not hear the *whole* cross-examination of the physician who described the wounds and fracture on the head of the deceased, does not affect his competency.

A witness having stated that, according to the description given by the examining physician, of the wound and fracture on the head of the deceased, he understood the fracture to be partly above and partly below the occipital protuberance, was asked by the prisoner's counsel, "whether a fracture of that part of the skull below the occipital protuberance could probably be caused by accident, because of its being thinner or weaker than the part of the skull on the occipital protuberance or immediately above it?" he replied that "from the description of the fracture as given by the examining physician, the fracture of the thin part of the skull of the deceased below the occipital protuberance could not have been caused by accident." The prisoner's counsel thereupon objected to the Court that the answer was not in reply to the question, and claimed that the prisoner was entitled to have the question answered; but the question having been repeatedly put to the witness and the same answer given, and the witness having stated that to be his only answer, the Court overruled the objection, and decided that the answer was proper and the witness should not be further pressed. On appeal, it was HELD :

That the Court properly interfered in not permitting the question to be further pressed.

A medical expert who, in a trial for murder, has heard a full description of the wounds and fractures on the head of the deceased, as given by the examining physician, and of the sink in which the body was found, and has examined the skull of the deceased, and the several fractures thereon, is competent to testify, as to "Whether from the nature and character of such fractures they could have been, or were likely to have been produced or inflicted

accidentally by falling into the sink, in the condition in which it has been described by the witnesses?"

The fact that prior to the trial of a party charged with murder, the Attorney-General handed to a witness who was examined on the trial as a medical expert, a written description of the wounds found upon the head of the mur-. dered man, prepared by the examining physician, together with a model of the sink in which the body was found, and that upon the examination then made, he had formed the same opinion testified to by him on the trial, in no manner affected his competency as a witness.

✗ A physician, who had practiced his profession for many years, being examined as a medical expert on a trial for murder, testified that he had given the sub- ject little thought, had not heard all the evidence describing the wounds of the deceased, and the sink in which the body was found, but had heard occasional parts thereof, had seen the skull of the deceased and examined the fractures thereon, and had seen and examined the model of the sink. HELD:

That the witness was competent to give an opinion as to whether from the nature and character of the fractures on the skull of the deceased, they could have been, or were likely to have been produced, or inflicted accidentally by falling into the sink, in the condition in which it had been described by the witnesses.

On a trial of the principal for murder, an accessory before the fact, whether jointly or separately indicted, is incompetent, either at common law or under the Act of 1864, ch. 109, to testify for the principal.

On a trial for murder, H, a witness in behalf of the prisoner, testified that on the day of the murder, he was at the office of S., and that S. looked at his watch and said it was then one o'clock P. M. The State then, for the purpose of discrediting H. by disproving material facts testified to by him, called S. who testified that H. was not in his office on the day specified while he was there, and that he did not look at his watch and say it was about one o'clock. The prisoner's counsel then called a witness, and proved by him the general good character of H. for truth and veracity; the State thereupon offered to prove by the same witness, the general good character of S. for truth and veracity—to this the prisoner's counsel objected. Held:

That as the purpose of the State was to discredit the witness H. by disproving material facts testified to by him, it was competent for the prisoner to sustain the witness by proof of his general character for veracity; and as the credit of the witnesses H. and S. was fairly put in issue, it was equally competent for the State under such circumstances to support the general character of its witness S. for veracity.

Davis *vs.* State.

Where the prisoner's counsel, in preparing bills of exception to the rulings of the Court upon questions of evidence, incorporates all the evidence given on the trial according to his view, and asks the Court to sign and seal such exceptions, the Court, if it deem it unnecessary to the full and fair presentation of the several exceptions reserved, that the record should be incumbered with *all* the evidence, may decline to sign the exceptions as presented, and may revise and remodel them in accordance with the requirements of the fifth Rule prescribed by the Court of Appeals for governing appeals.

APPEAL from the Circuit Court for Washington County.

The case is stated in the opinion of the Court.

In behalf of the appellant this Court was asked to pass an order requiring the Judges of the Circuit Court for Washington County, to certify and transmit to this Court *all the testimony* taken at the trial of the cause in the Circuit Court; after argument, the prayer of the petitioner was refused.

The cause was then argued before BARTOL, C. J., STEWART, BRENT, MILLER and ROBINSON, J., and the rulings of the Circuit Court were unanimously affirmed.

A re-argument being requested by one of the Judges who concurred in the opinion, a re-argument was ordered under the fifteenth rule of the Court, and the cause was re-argued before BARTOL, C. J., STEWART BRENT, BOWIE, GRASON, MILLER, and ROBINSON, J.

*William P. Maulsby*, for the appellant.

The rule in regard to experts is, that the opinion of witnesses possessing superior skill is admissible, whenever the subject-matter so far partakes of the nature of a science, as to require a course of previous habit or study, in order to the attainment of a knowledge of it. But not when the enquiry is into a subject-matter, the nature of which is not such as to require any peculiar habits or study, in order to qualify a man to understand it. *Car-*

*ter vs. Boehme,* 1 *Smith's Leading Cases, marg.* 286, *and cases there cited. Jones vs. Tucker,* 41 *N. H.* 546; 1 *Greenleaf on Ev.,* (12 *Ed.*) *notes* 3, 4, 5 *to sec.* 440. .

The very foundation for the theory of expert testimony is that of his superior knowledge in relation to the subject-matter of which he is permitted to give an opinion, by which he, in a degree, assumes the functions of a jury. *Heald vs. Thing,* 45 *Maine,* 397, 398; *Dickinson vs. Barber,* 9 *Mass.* 225.

A witness cannot be permitted to give his opinion as an expert until it appears, by a preliminary examination, that he is a person of skill in the particular subject-matter in which his opinion is desired, and it must *also appear* that he has reliable information or knowledge of the facts involved, and on which his opinion is to be founded, before he can testify.    An expert *must state* the circumstances from which he draws his conclusions—in other words, the facts on which he grounds his opinion.

It is incompetent for a physician, who did not hear *all the evidence* on the subject-matter of his opinion, to give an opinion founded on the portion heard by him.    *The People vs. Lake,* 2 *Kernan,* 358-63-4.

An expert, who has heard all the evidence, cannot give an opinion on the general question of sanity or insanity. That is the question of fact for the jury.    But he may testify whether such a fact proved, indicates insanity.

An expert cannot be allowed to give his opinion upon the case, because the case, in point of fact, upon which he might give his opinion, might not be the case which the jury, on the evidence, would find, and there would be. *no certain means of knowing whether it was so or not.* It is not the province of an expert to draw *inferences of fact* from the evidence, but simply to declare his opinion upon a *known* or *hypothetical* state of facts.    *United States vs. McGlue,* 1 *Curtis' C. C. R.,* 9.

A physician may be called to shew the position, direction and extent of a wound, and the obstacle an instru-

ment might meet with in its progress, but whether in a certain relative position, and in a particular manner, or by a particular motion, certain muscular strength would be equal to the infliction of a certain wound, seems to be more properly a matter for the jury upon the facts. *Goodwin's Case, referred to in* 3 *Phillips Ev.*, 273.

Third Exception.—The facts, of the description of the wounds, and of the condition of the sink, on which the opinion of the witness is predicated, are not given. It does not appear what those facts were, either from the testimony of the witness, or from any other proof in the record. It shews peculiarly, an assumption by the witness of the province of the jury. He finds facts in his own mind, and keeps them there. The admissibility of the opinion of this witness, in the condition of the record, is denounced by all the authorities.

Whilst to make the opinion evidence, even if the facts on which it was founded were disclosed, it *must appear* that the subject-matter so far partook of the nature of a science as to require a course of previous habit or study, in order to the attainment of a knowledge of it; it *does appear* from the proof of the witness, that the subject matter was *not* of that character—that only one of the elements of the opinion partook of a scientific character—his knowledge of the anatomy of the skull; and that as to all the other elements, his knowledge had no relation to science, study or habit. It is a case in which the witness ought to have been confined to a statement of his professional knowledge, the anatomy of the skull, and that fact given to the jury in connection with all other facts of description of wounds, and of condition of sink, to have enabled the jury to form its own opinion on the point involved in the question put to the witness.

The fact is, the subject-matter on which these experts testified, was accident, and nothing else. The question was, could the wound have been, or was it likely to have been, inflicted by *accident?*

These views are equally applicable to the eighth, twelfth and fourteenth exceptions.

The ninth and fourteenth exceptions present the case of witnesses giving opinions who had not heard all the testimony—the testimony in the fourteenth being obnoxious to that objection, as well as to the objections presented in the third, eighth and twelfth.

The thirteenth exception presents the case of an opinion formed on the declarations of others, on a description of wounds and of sink—given to witness out of Court—and an opinion formed on those declarations when made, *confirmed* by the proof in Court, *and* an examination of the skull of deceased. But, however viewed, it still appears that the declarations made by the Attorney-General out of Court, formed an element, in the basis of facts, on which the witness predicated his opinion. It was formed on the declarations. It was only confirmed by the proof.

The third, eighth, twelfth and fourteenth exceptions raised, *also,* the question of the competency of the question put by the State to each of the witnesses, to wit: Could such wound or fracture have been, or was it likely to have been, inflicted by the deceased, accidentally falling into the sink, &c.? The question in the twelfth exception being substantially identical with that in the others.

The State was bound to prove the issue on its part— that death had resulted from means employed by the prisoner. It was competent only for the State to offer evidence tending to prove that fact. Whether the deceased *might* or *not* have come to his death by accident, in one way or another, did not tend to prove that the prisoner had murdered him, as laid in the indictment. The proof was incompetent, because not pertinent to the issue. Whether it might have been admissible in reply, if the prisoner had offered proof tending to shew a probability of accidental death by falling into the sink, is not the question.

The questions objected to were not asked in reply, but in chief.

The question stated in the first exception is liable to the same class of objection. It was not competent for the State to prove what kind of instruments *could* have inflicted the wounds, or in the language of the witness, *might* have done so, but only to prove what kind of instruments *did inflict*, or did *probably* inflict the wounds.

The second exception ought to be sustained, because the cross-examination was legitimate and proper. No more fair, plain, direct question could be asked to test a witness'' knowledge. It was the knowledge of the witness as an expert, the extent and correctness of his information, which was immediately in question; and to that, and that only, the question was addressed. The exception shows that the cross-examination was proper, and sought only to test the witness' knowledge, and did not seek to have the statements of a book to be given to the jury. The witness had stated that a particular thing, touching his scientific knowledge, was to be found in a particular book. Was that thing to be found in that book? If so, nothing could be more plain, fair, and direct, than to ask the witness to find it! If it were not so, then it followed that the scientific knowledge of the witness, necessarily founded on books, to an extent at least, was inaccurate to the extent involved in the question, and answer How far such inaccuracy might affect the confidence of the jury in the accuracy and value of the testimony of the witness, is, by law, a matter for the jury alone.

In the fourth exception the Circuit Court assumed that no state of facts could be testified to in the case other than had been. In most cases there are two sides, and only one is heard at a time. But, as shown by this exception, it was assumed that the other side could have no state of facts to which to apply the proof sought to be given. But, it is submitted, that adopting the Court's view, that

the defence could not be allowed to prove any facts incon-
sistent with the State's theory, the question was clearly
admissible.  The only scientific knowledge which the
witness had, was, as to the anatomy of the skull, and the
thickness of the skull bone, and it would be hard, indeed,
if the defence could not be allowed to get out all the
knowledge of the witness on the very subject to which he
had testified.  He had just proved that the wound and
fracture could not be caused by accident, because of the
anatomy of the skull—that is, the mortal wound, but that
others might have been.  Now, which one of the wounds.
was the mortal one?  *Non constat!*  The witness had just
spoken of the wound as being on the occipital bone, and
involving, &c., &c.  Yet the defence is prohibited from
cross-examining on the very matter of the testimony-in-
chief.

The fifth, sixth and seventh exceptions are all addressed
to the same point, to wit : the refusal of the Court to per-
mit the scientific skill of Dr. Manakee to be tested by
proof that he had done, and omitted to do various things
which the science in which he claimed to be an adept,
prescribed in like cases.

The tenth exception sufficiently states the question
raised.  The witness was asked a plain question, and
refused to answer it, and the Court decided that the pre-
tended answer was *proper*, and would not permit an
answer to the question proposed to be sought.

The eleventh exception ought to be sustained, and the
ruling reversed.  The so-called admission made by the
Attorney-General was not an admission of the fact offered
to be proved, in behalf of the prisoner.  The pretended
admission was not accepted, as a correct statement of the
fact, at least by the prisoner.  The Court would appear
to have so accepted it.  The right to a correct statement
of the fact, and to accept or reject a pretended admission,
was the right of the prisoner, not of the Court.  The so-

called admission was not correct in point of fact. The clear question is, whether a Court has a legal right to reject testimony offered to prove one fact, because the opposite party states another fact.

The twelfth, thirteenth and fourteenth exceptions show, that to the experts named in them, had, for the first time, been submitted a new piece of evidence—the skull of the deceased, which had been denied to the previous experts. It was not competent for the State to offer the opinions of experts, based on all the testimony, and to withhold from them a part of the testimony, as in this case, and afterwards to introduce it.

The fifteenth exception was as to the competency of an alleged accessory as a witness. Shew was not jointly indicted with Davis. Davis was indicted for murder, and by a separate indictment Shew was charged with having been accessory before the fact. The fact that the indictments were separate, and not joint, controls the question presented to this Court. The question is whether Shew, arraigned on one indictment, is a competent witness in behalf of Davis, arraigned on another, separate indictment. To say nothing of the rule of the Common Law, in which the distinction is broad, in this respect, between the competency to testify of parties when jointly, and when separately, indicted, it is sufficient in this case to shew that, under the Act of 1864, that testimony was competent. This argument of course assumes that it was not competent at Common Law; which, however, the appellant's counsel does not consider to be correct. If not competent at Common Law, it is on the ground that the witness produced is interested in the result of the case, in which he is offered as a witness. The rule is the same, resting on the same ground, in civil and in criminal cases. This rule, as it existed at Common Law, applied in Maryland until the Act of 1864. That Act annulled the rule of the Common Law, which made interest in the event of

Davis *vs.* State.

the suit a disqualification to testify. It provided, in terms too clear to be mistaken, that interest in the result should not disqualify a witness, in civil or criminal cases. There is no distinction between civil cases and criminal cases. Evidence shall not be excluded in either class of cases, on the ground, merely, of interest. Such is the provision of the 1st section. Then the 3d section provides that no witness shall be competent or compellable to testify *in his own case* The language is : "No person who, in any criminal proceeding, is charged with the commission of an indictable offence, or any offence punishable on summary conviction, shall be competent or compellable to give evidence for or against himself."

The effect is plain, clear and simple It secures the citizen against being made a witness against himself, on an indictment against himself. His exclusion is in the case of a criminal proceeding, *in which he is charged* with the commission of an indictable offence, and not in the case of a criminal proceeding in which *another party* is so charged. It is to secure a party accused, his Common Law privilege. If he be permitted to testify in his own case, in his own behalf, he must testify as to all the facts involved ; and so against himself as well ; and thus be compelled to answer questions tending to criminate himself. To leave this privilege unimpaired, the statute provides that *in the proceeding in which he is charged*, he shall not be competent. But it also provides that no person offered as a witness, shall be excluded by reason of incapacity from crime, *or interest*, from giving evidence in the trial of any issue, or of any matter or question, arising in any suit, action, or *proceeding*, civil or criminal ; and that every person so offered shall be admitted to give evidence, notwithstanding he may have an interest in the matter in question, or in the event of the trial of any issue, matter, question, or inquiry, or of the suit, action or proceeding, in which he is offered as a witness.

And yet the only question here is, whether Shew is a competent witness in the case of a separate indictment against another person, notwithstanding he may have an interest in the result of the trial in that proceeding. The Act of 1864 says, in express terms, that he shall be competent. The Court below says that he shall not, notwithstanding the express terms of the Act of Assembly. And the point before this Court now is, merely, whether the Court can, of its own mere motion and will, abrogate, annul, or repeal, a statute. It is not to be done by construction, because there is no room for construction where the terms of the statute are plain and consistent, as they are in this case. If it were done under the name of construction, it would be simply the misapplication of a descriptive term, having a perfectly defined meaning and office, to the actual office of repealing a statute; which office resides in the Legislature, and not in the Courts.

It is supposed that the case of *The Queen vs. Payne and others*, 1 *Crown Cases Res.* 349, (*Law Reports*,) touches or controls this question. In that case four parties were jointly indicted for one and the same offence, and jointly tried. In this case Davis and Shew were separately indicted, and separately tried, for different offences—Davis on the charge of murder, Shew on the charge of being accessory before the fact. In that case one of the four parties, on trial, was called as a witness by another of the four on trial. The question was whether he was competent to testify in the case in which he was on trial, at the demand of another party, to the same case, being tried jointly with him. The Court decided that it was not the intent of the British statutes, said to be similar, in effect, to our own Act of 1864, that a party charged should be competent to testify in his own case, although at the instance of another party jointly charged with him in the same indictment, and undergoing the same trial. That the statutes did not change that feature of the an-

cient law of England, which disabled a party from testifying in his own case. The Court did not decide that a party was incompetent as a witness in the case of another party on trial, although the witness offered might have an interest in the result of the trial. It did not decide that the ancient law of England, which rendered witnesses incompetent who might have an interest in the result of the case in which they were called, remained unchanged. The language of the statutes did change that rule in clear and unmistakable terms. They abolished incompetency from interest. The very object of the statutes was to introduce a new rule in respect of interest. The only question was, whether the change were so radical that a party indicted could testify on the trial of his own indictment. It was contended that the change of rule, effected by the statutes, was so complete and thorough, that a party, though on trial jointly with another, could be called as a witness by that other, and so become a witness on his own trial; but the Court said that the provision of the statutes was otherwise; and decided that as the party called as a witness was himself on actual trial, in that case, he must, of necessity, testify in his own case, if he were admitted, and not merely in a case in the result of which he had an interest. The Court did not, in that case, undertake to weigh the interest of the witness offered, or to decide that he was competent or not, according to the extent and nature of his interest, but confined itself simply to the question before it, to wit, the competency of a person jointly indicted with others, and on joint trial with others, for one offence, to testify in that case.

Chief Justice COCKBURN, in his opinion, did not say, and it is plain, from the whole case, that he did not intend to say, that although the statutes had, in the clearest terms, abolished incompetency on account of interest—the law, in that respect, as it had existed, remained unaltered.

There is no parallel between that case and this. There would be if Shew had been indicted jointly with Davis, and had been on joint trial, when offered as a witness. The record shews that he was not jointly indicted with Davis, and was not on trial when he was offered as a witness. The record shews that there was and could be no objection to his competence, except his interest in the result of the trial of Davis ; and the Act of 1864, in the clearest language, says that that interest shall not exclude him. See 1 *Greenleaf on Ev.*, sec. 379 ; 2 *Russell on Crimes*, 968 ; 1 *Starkie on Ev.* (1842) 144, *and notes ; United States vs. Henry*, 4 *Wash. C. C.* 428.

The sixteenth exception presents the naked question, stripped clean of all covering, or obscurity, whether it is legally competent to introduce proof to sustain the general character of a witness for truth and veracity, when that witness has not been impeached, either by evidence to contradict any fact stated by him, or by evidence of bad character. Is it competent in law to impeach testimony by a witness, and thereupon to sustain the general character of the impeaching witness, before a whisper has been heard contradicting his testimony, or impeaching his general character? It may be true that the credibility of Sweitzer was, to some extent, put in issue, by the fact of his contradicting, and seeking to impeach the character of, a better man than himself. But, if so, that issue was made by himself, or by the State that called him ; and the question of law is whether, in that case, it is competent to sustain the general character of a witness who has impeached another, merely because he has impeached him.

*Attorney-General Syester*, for the State.

The inquiries made by the prosecution, and which gave rise to the first exception were proper and material, and the witness was competent to respond to them ; the nature

or kind of instrument which could have produced wounds like those he examined, could well be judged of by him, as well from the extent and degree of injury produced, as from the appearance of the wounds themselves, whether they were cut or torn, lacerated or otherwise; and his knowledge of the anatomy of the human skull, the comparative strength of its several parts, where weak and where strong, would furnish him with some data on which to form a judgment as to the nature and kind of instrument which could have produced such wounds and fractures.  Whether such opinion, when formed and given, find supporting and confirmatory facts in the further developments of such cases, or the opposite, is no question here.  It was an item of legitimate proof—material in the chain of evidence—and the witness was competent to respond to the inquiry.  Indeed, it would seem to be taken for granted, that the party examining the body should give special attention to the wounds, &c., for the very purpose of responding to that very inquiry. See *Whart. & Stillé Med. Jurisp.*, sec. 796, *under Title* "*Examination of the Body;*" *State vs. Knight*, 43 *Maine*, 11.

The second, fifth, sixth and seventh exceptions may be considered together.  They present the question whether the opinions and statements, in the books on Medical Jurisprudence, can be laid before the jury at all, and it is submitted that they can neither be read by the witness nor counsel; nor can what *they* contain in any manner be laid before a jury; they are but unsworn statements.  To tell what another has said, is universally regarded as hearsay.  To tell what he has written is nothing better. To lay the writing before the jury is to violate two fundamental rules of evidence; 1st, that what reaches the jury shall be accredited by the oath of the party; and, 2nd, it deprives the party against whom it is offered of the power of cross-examination.

And whether medical science prescribes rules for the ascertainment of data, was wholly foreign to any inquiry before the Court. The Courts prescribe their own rules, and are not to be governed by the fluctuating judgments of scientific writers on the subject. And what is said by medical writers on these subjects can furnish no governing rule to either Court or jury. *Collier vs. Simpson,* 5 *Carr. & P.,* 74; *Ware vs. Ware,* 8 *Greenleaf,* 56, 57; *Commonwealth vs. Wilson,* 1 *Gray,* 337; *Cocks vs. Purday,* 2 *Car. & Kir.,* 270.

The fifteenth exception is important, and presents the question: "Is a party charged as accessory before the fact, a competent witness for the principal felon?" The question must be examined from two stand-points: 1st. What is the Common Law rule? And 2d. Has the Maryland Evidence Acts changed the Common Law rules in this regard?

An accessory is he, who being absent, yet counsels, incites or procures another to commit the felony. 1 *Chitty Cr. L.,* 262; 1 *Hale,* 615; 4 *Bla. Com.,* 36. And at the Common Law it was his right and privilege to require conviction of the principal felon, before he could be put on trial himself. 4 *Bla. Com.,* 40, 323; 1 *Ch. Cr. L.,* 266; 1 *Hale,* 623; *Hawk, b,* 2 ,ch. 29, *sec.* 36. And although this privilege is denied him by *Stat.* 1 *Anne, ch.* 9, *sec.* 2; and 22 *Geo.* 3, *ch.* 58, *sec.* 1; and 3 *Geo.* 4, *ch.* 38, in certain cases, larceny, &c., yet those statutes have no application to this case, and are not in force here. The ancient Common Law right to withold his plea until after conviction of the principal, is unaffected by any legislation in this State.

The guilt of the accessory, is wholly dependent on the guilt of the principal, if the latter is acquitted, the former cannot be tried as accessory to the principal crime. *U S. vs. Crane,* 4 *McLean,* 317; 1 *Starkie on Ev.,* 296; 1 *Russel on Cr.,* 42. And where the accessory is tried

first, and found guilty, and the principal is afterwards tried and *acquitted*, the previous conviction of the accessory is annulled. No judgment can go against him. 1 *Burns' Justice*, 7, 8; 1 *Hale's Pleas Cr.*, 623, 624; *Baron vs. The People*, 1 *Parker Cr. R.*, 246, 250; 2 *Hale's Pleas Cr.*, 222, 223, 224. And where both principal and accessory are arraigned together, and plead together, the jury shall be charged to inquire "*first* of the principal, and if he be found not guilty, to acquit the accessory." 1 *Hale Pl. Cr.*, ch. 58, p. 624; 1 *Burns' Justice*, sec. 4, p. 8, *pla.* 5. The foregoing authorities establish the interest of the accessory in the acquittal of the principal. And the fact that they were in this case separately indicted, does not affect the question of interest. *Baron vs. People*, 1 *Parker Cr. R.*, 246; 1 *Hale's Pleas Cro.*, ch. 58, p. 623; 1 *Burns' Justice*, 7. The disqualifying interest at common law, was tested by the witness' interest *in the result*, and a party was interested in the result where the record could be used for any purpose for or against him. *Middlekauff vs. Smith*, 1 *Md.*, 340; 1 *Greenl. Ev.*, secs. 392, 394. Hence all the authorities declare, that at common law, the accessory is incompetent to testify for the principal. 1 *Greenl. on Ev.*, 407; 2 *Starkie's Ev.*, part 4, pp. 763, 764; 2 *Russell on Crimes*, (6th *Am. Ed.*,) 978.

2nd. Have the Evidence Acts of this State changed the rule?

This question depends on the construction of the Act of 1864 alone; that of 1868 has no bearing upon it. The first section of the Act of 1864, would seem to be broad enough to comprehend this case; but the interpretation of the third section must determine the question. By that section it is declared, that "No person who in any criminal proceeding, is *charged with* the commission of an indictable offence" * * * shall be *competent* to give *evidence for himself*, neither shall he be "compellable to

*give evidence against himself,"* nor *answer any question* tending to *criminate himself.* Each of these are important to be considered, and their significance would, without anything more, seem to be decisive of the question.

A party charged with the commission of an indictable offence, shall not give evidence *for* himself; he shall not be compelled to give evidence *against* himself; he shall not be compelled to *answer any question* tending to criminate himself. *Is not this leaving the party precisely where the Common Law placed him?* How a party clothed with such immunities, and surrounded with such exemptions, could become a witness in a trial, in the result of which he has a direct, present and overwhelming interest as an accessory has in the trial of his principal, is impossible to conceive. If he testify for the principal, he is testifying for himself. If he testify against him, he is making up a case against himself, because in the first case an acquittal is his unqualified discharge; and, in the second place, a conviction, on his evidence, makes out a most material ingredient of the crime charged against him, to wit, the guilt of the principal. He shall not be compellable to "answer any question tending to criminate himself." What a mockery would a cross-examination be in such a case! Should such a witness be asked anything *tending to criminate the principal felon,* his answer *tends* to *criminate himself,* and he need not answer. This is not only in the teeth of the Act of Assembly, but in violation of the 22nd Article of the Bill of Rights.

It is to be noted, too, that the 3rd section of the Act of 1864, is couched in language sufficiently comprehensive to embrace this very case. No one "*charged* with an indictable offence," can be either examined or cross-examined in any case where he is interested, and it is wholly immaterial whether such interest arise from a direct interest in the result of the case, or by being a party to the record.

But the Maryland statute seems to be copied from the British Evidence Statute, and the force and effect of the third section has received a judicial interpretation by the sixteen Judges sitting as a Court of Criminal Appeals, as late as January, 1872, in the case of the *Queen vs. Payne and others*, 1 *Crown Ca. Res.*, 349, (*Law Rep.*)

In that case it was expressly declared, that the exception in 14 *and* 15 *Vic.*, *ch.* 99, *sec.* 3, "was introduced to *prevent any possibility* of its *being* thought that the law, as it had existed from the earliest times, was altered by the Act."

An examination of the British Evidence Act, and comparison with the Maryland Act, will show an exact conformity in substance, and in almost corresponding language, whilst the 3rd sec. of the Maryland Act, and the 3rd sec. or proviso of the British Act, are identical in language.

The Maryland Act is a copy, with slight and unimportant alteration of language and arrangement. The English Court has construed the 3rd section as being "introduced to prevent any *possibility* of its being thought that the law, as it existed from the earliest times, was altered by the Act."

The case of the *Queen vs. Payne*, goes far beyond anything contended for in this case. There the acquittal of Payne would not have contributed in any respect to the interest or advantage of the witness, and in testifying, the witness was not swearing for himself. He was excluded only because he was a party to the record, and because the ancient rule of the common law, was not intended by the Act to be broken up. See also *Taylor's Ev.*, (*6th Ed.*,) 2270.

[At the instance of the Attorney-General, his argument on other points in the case is omitted.—REP.]

ROBINSON, J., delivered the opinion of the Court.

On the 5th of April, 1872, Abraham L. Lynn, was found dead in the *sink or bin of his mill*. Six wounds were discovered on his head, one of which the examining physician pronounced mortal  The appellant, an employé of the deceased, was arrested, tried and convicted of the murder.

At the trial, certain exceptions were taken, under the provisions of the Act of 1872, to the rulings of the Court. These exceptions were heard in December last, and the five Judges before whom they were argued, were of opinion that no error had been committed by the Court below, and that the said several rulings ought to be affirmed. By the request of one of the Judges who concurred in that opinion, these exceptions have been re-argued, and the case has received that patient and careful consideration which its importance and gravity demanded.

We propose now to consider the exceptions thus relied on, in the order in which they are presented by the record.

First. Doctor Manakee, the examining physician, was asked to "state to the jury what kind of an instrument could, in your opinion, have inflicted the wounds found on the head of the deceased?"

It is contended, that the question involves a *mere possibility* and *not a rational probability*, as to the nature of the weapon used. We do not think however, it is liable to any such objection. The witness had examined the wounds on the head of the deceased, and the sink or bin in which the body was found; and had examined also, the iron *crowbar* and *adze*, both of which were found in or about the mill. The fair import and meaning of the question under such circumstances, was to ascertain from the witness, the nature and character of the instrument by which the wounds were, in his judgment, inflicted.

The answer clearly shows, the witness so understood it, for he says, the wounds might have been inflicted by a *crowbar or an adze,* and in support of this opinion, he further states, that assuming the blow to have been given from a certain direction, he found the *crowbar* fitted *the depression* in the skull.

The second exception arose upon the cross-examination of the same witness. No *autopsy* of the body was made, the examination being confined to an external examination of the wounds. The witness was asked if there was any medical or scientific term, distinguishing the examination thus made, from autopsy? To which he answered, "some books on Medical Jurisprudence called it an *examination of the body.*" In answer to the further question, as to what book, witness replied, "*Taylor;*" whereupon the counsel for the prisoner, handed the book to the witness, and asked him to turn to that part of it in which such an examination was so designated. If the purpose was to test the medical knowledge of the witness, the mode proposed certainly was not a very satisfactory way to do so. The medical knowledge of a witness, who is competent to testify as an expert, it is but fair to presume is founded upon authorities so differing in value, and upon such various degrees of practice and experience, that it is doubtful, to say the least of it, whether the accuracy of his recollection as to a technical term used by a writer, can be said to test in any manner, his general knowledge and experience. Be that however as it may, we are of opinion that the book could not be handed to the witness even for such a purpose. Courts are not presumed to be familiar with the principles, or the terms used by medical authors, and when questions arise, necessarily involving their application, they must. be proved as facts are proved, by witnesses competent to testify in regard thereto. Medical books are not admissible in evidence, either for the purpose of sustaining or

Davis *vs.* State.

contradicting the opinion of a witness. *Collier vs. Simpson*, 5 *Carr. & P.* 74 ; 1 *Greenleaf on Ev. sec.* 440.

In the third exception, having proved by Doctor Herring, that he had been a practising physician for eighteen years, and that he had heard Doctor Manakee's description of the wounds, and had heard also the description of the sink or bin in which the body was found, the State proposed to ask the witness whether "from the nature of the wound and fracture described by Doctor Manakee as fatal, such wound and fracture could have been or were likely to have been, inflicted by the deceased accidentally falling into the sink in the condition in which it had been described by the witnesses?"

This question is objected to in the first place, on the ground that the subject-matter of inquiry, is not of such a character as to warrant the introduction of *expert testimony*. It may be difficult sometimes to determine whether the matter of inquiry, is such as to permit the opinion of experts to be offered in evidence. Witnesses ordinarily are permitted to testify only in regard to facts, and upon the facts thus proven, the tribunal before whom the case is tried, is presumed capable of forming a correct judgment. In the trial of cases however, it often happens, that questions arise, touching the matter of inquiry quite out of the observation and experience of persons in general, but within the observation of others, who from previous study or pursuits, or experience in life, have frequently and habitually brought that class of questions under their observation. And hence it is, that in such cases, persons who from study or experience, have acquired a peculiar knowledge in regard thereto, are permitted to testify, not only as to facts, but also to give their opinions based upon facts within their own knowledge or upon facts proved by other witnesses. The weight to be attached to this kind of evidence, and the grounds upon which it is founded, are matters of course

for the consideration of the jury, the sole purpose in thus relaxing the rules of evidence in such cases being to aid jurors in forming a correct judgment in regard to questions, which it is but reasonable to suppose that the witness from his peculiar knowledge and experience, is more competent to judge of than they themselves. Without attempting therefore, to lay down a precise rule applicable to all cases, it is enough to say, that whenever the matter of inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it; or in other words when it so far partakes of the nature of a science or trade, as to require a previous habit or experience or study, in order to the attainment of a knowledge of it, the opinion of experts is admissible. On the other hand, if the matter of inquiry is not such as to require any peculiar habits or study, in order to qualify a person to understand it, then such evidence is not admissible. *See Carter vs. Boehm,* 1 *Smith's Leading Cases,* 631, (*marg.*)

Here the body of the deceased was found in the sink or bin of his mill, with six wounds on the head, one of which involved a fracture of the skull, and in the absence of direct proof, the question as to how and by what means they were inflicted, depended to some extent at least upon the character and appearance of the wounds themselves. The inquiry then involved not only the general appearance of the wounds and the extent of the injury, whether they were inflicted by a sharp, or by a dull instrument, or by accidentally falling into the sink, but also some knowledge at least of the anatomy of the skull—the relative strength and weakness of the several parts thereof—questions which could only be satisfactorily determined by the skill and experience of persons accustomed to and familiar with the examination of wounds.

In the next place, it was contended that the record, did not contain such a description of the wounds, and of the

construction and condition of the sink, as to enable this Court to determine whether a proper foundation had been laid for the introduction of this kind of testimony. It does appear, however, that the body was found in the sink, with several wounds on the head, one of which involved a fracture of the skull, and that a crow-bar found in the mill fitted the depression in the skull, caused by this fracture. These facts are sufficient, in our opinion, to lay the foundation for the admissibility of the evidence of experts, who from their knowledge and ex-. perience in regard to the nature of wounds, are better qualified than ordinary persons to form an opinion, as to how and by what means the injuries thus found on the head of the deceased, were inflicted. The preliminary question to be decided by the Court, whether the subject-matter of inquiry was of such a character as to admit of the introduction of expert testimony, depended solely upon the *nature* of the wounds, and not upon the description of the sink, or instrument by which in the opinion of the witness they were inflicted.

The question in the fourth exception as to whether, leaving out of view the description of the wound and fracture on the back part of the head, as testified to by Dr. Manakee, that part of the skull below the occipital protuberance, would or would not be liable to be fractured by accident, was clearly irrelevant, and therefore properly rejected. In questions of skill and experience, facts, strictly speaking, *collateral*, may sometimes be proven, provided they tend to illustrate the opinion of witnesses touching the *subject-matter* in issue. *See* 1 *Taylor on Ev.*, 349. But the question here, was whether the wound and fracture found on the head of the deceased, and described by the examining physician, were occasioned by accidentally falling into the sink, and the fact that some other part of the skull, as for instance the part below the occipital protuberance, might or might not be

fractured by accident, tended in no way to enlighten the jury in regard to the inquiry before them.

The questions in the fifth, sixth and seventh exceptions, as to whether it would not have been proper, according to the rules stated by medical authors, and more conducive to certainty in respect to description and location of the wounds and fracture, that one of the examining physicians should have made notes of the examination of the wounds as they were examined;—or whether there are any rules prescribed by medical science for conducting an examination of the body or the skull, for the purpose of ascertaining an accurate description of the wounds in respect to their character and precise location;—or whether according to the rules of medical science, notes of the post-mortem examination, ought to have been made at the time of the examination, were clearly inadmissible. Rules prescribed by medical authors cannot be offered in evidence, and if the purpose was to show that the examination of the wounds and fracture was not made in a *proper* and *skilful* manner, this could only be done through the testimony of witnesses competent to testify on the subject.

The ruling in the eighth exception must be affirmed, for reasons assigned under the third exception. Doctor Billingslea had heard Doctor Manakee describe the wounds on the head and the fracture on the skull, and heard several witnesses describe the construction and condition of the sink, and upon the facts thus proven, it was competent for him to say whether such wound and fracture were likely to have been occasioned by accidentally falling into the sink.

On cross-examination of this witness, he said he had not heard the entire testimony of Doctor Manakee—that he heard his testimony from the time he was called to the stand up to about 1 o'clock P. M., but did not hear his continued cross-examination from 2 o'clock, P. M.,

to 4 o'clock, P. M., but that he heard Doctor Manakee describe *fully the nature and character of the wounds*, and heard a *full description* by several witnesses of the *construction* of *the sink* and *its condition* at the time the body was found. Whereupon the prisoner, by his counsel prayed the Court to strike out the proof, offered by the State, of the opinion of this witness, and to instruct the jury that it was not to be considered by them.

In some cases, it may be proper for the Court to refuse to allow an expert to give his opinion upon facts proved by a witness, unless he has heard all the testimony of the witness, because in such cases the entire testimony may be necessary, in order to enable him to form an opinion in regard to the subject-matter of inquiry. But here, the witness had heard the examining physician describe fully the nature and character of the injuries, and had heard several witnesses describe the construction and condition of the bin or sink, and upon these facts we think it was competent for him to say whether such injuries were likely to have been occasioned by accidentally falling into the sink, although he was not in fact, present during the whole cross-examination of the witness. If the cross-examination elicited anything new in regard to the wounds or the sink, different from what was testified to in the hearing of the witness, the prisoner could have inquired of the witness, whether such facts affected in any manner the opinion he had formed. After all, the opinion of the witness, and the grounds upon which it was formed, and the weight to be attached thereto, were matters for the consideration of the jury.

In the tenth exception the witness, after having answered the question propounded to Doctors Herring and Billingslea, in the third and eighth exceptions, said that according to Doctor Manakee's description of the wound and fracture, he understood the fracture to be partly above and partly below the occipital protuberance;

the prisoner's counsel then asked the witness "whether a fracture of that part of the skull below the occipital protuberance could probably be caused by accident, because of its being thinner or weaker than the part of the skull on the occipital protuberance, or immediately above it?" To which, the witness answered, that "from the description of the fracture as given by Doctor Manakee, the fracture of the thin part of the skull of Lynn, below the occipital protuberance, could not have been caused by accident," whereupon the prisoner by his counsel, objected to the Court, that the answer was not in reply to the question, and claimed that the prisoner was entitled to have his question answered; but the question having been repeatedly put to the witness, and the same answer given thereto, and the witness having stated that to be his only answer to the question, the Court overruled the objection and decided that the answer was proper, and that the witness should not be further pressed with the question. It is no doubt the duty of a witness to answer such questions as the counsel have the right to ask, and should he capriciously refuse, the Court will interfere and compel him to answer. There does not seem, however, to have been any unwillingness on the part of this witness to answer the question as he understood it. The question was purely an abstract one, and the witness answered it as being connected with some of the facts in the case, that is from the description of the wound and fracture as given by Doctor Manakee, the fracture on the thin part of the skull of the deceased could not have been caused by accident, and the question being repeatedly put to the witness and the same answer given thereto, and the witness having stated he had no other answer to give, the Court, we think, properly interfered in not permitting the question to be further pressed.

In the eleventh exception the prisoner offered to prove by the witness that Professor Tonry, had been em-

ployed by the State as a chemical expert in this case, for the purpose of analyzing and detecting blood marks, and had been examined by the State as an expert on the previous trial of this case at Westminster, and had had in his possession for the purposes of analysis the clothes of the prisoner,—that the supposed blood marks on the gable-end wall of the mill spoken of by witness had not been submitted to him, and are now the same on said wall as when witness first saw them, &c. The State objected to so much of the testimony of said witness as was offered to prove that Professor Tonry *had been employed in the former trial to analyze or subject to chemical tests, certain supposed blood-stains* on the *clothes of the prisoner*, and the Court sustained the objection. Before, however, the *exception was signed*, "the State admitted to the Court and to the jury," that "Professor Tonry had been employed on the former trial of this cause at Westminster, as an expert to apply chemical tests to the said clothes, and that he had not applied any chemical tests to said spots on the wall of the mill," &c. The State having thus admitted the facts in regard to which evidence was offered, and to which the objection had *been* made, and this too, before the bill of exceptions was filed, it is very clear the prisoner was not prejudiced by the ruling of the Court, and the question as to whether the ruling was right becomes wholy immaterial.

It appears by the twelfth exception that the skull of the deceased had been brought into Court, and the witness, Doctor McKee having testified that he had been a practising physician for 38 years, that he had heard the testimony of Doctor Manakee, and the description of the sink by the witnesses, and that he had examined the skull of the deceased, and the several fractures thereon, it was clearly competent for him to answer the question, *"whether from the nature* and *character of the fractures on that skull, as now shown you, such fractures could have been, or were*

*likely to have been produced or inflicted accidentally by fall-ing into the sink, in the condition in which the sink had been described by the witnesses?"*

. The objection to the testimony of Doctor Dorsey was also properly overruled. He had heard the testimony of Doctor Manakee, and others, describing the wounds and the sink, and had seen and examined the skull of the deceased, and was competent to testify as an expert. The fact that prior to the trial, the Attorney General had handed to the witness a written description of the wounds, prepared by the examining physician, together with a model of the sink, and that upon the examination then made, he had formed the same opinion, testified to by him on the trial, in no manner affected his competency as a witness. Whether the opinion given in evidence by the witness was a fair and impartial one, was a matter for the jury. The fact that an expert, has formed an opinion upon the subject-matter of inquiry after reflection and deliberation, and upon consultation with others of skill and experience, surely does not render him incompetent as a witness.

Doctor Scott, the witness offered in the fourteenth excep-tion, had been a practising physician for many years, had given the subject little thought, had not heard *all the evi-dence* describing the *wounds* and the sink, but had heard occasional parts thereof,— had seen the skull of the deceased produced in Court and examined the fractures thereon, and had seen the model of the sink which had been offered in evidence, and had examined it. The State then asked the witness the same question that had been put to Doctor McKee, in the twelfth exception, to which the prisoner objected. Now if the opinion of the witness which it was proposed to give in evidence had been based upon the description of the wounds and the sink, as testi-fied to by other witnesses, there might be some ground for contending that a proper foundation had not been laid

for the introduction of such evidence. But here the witness had examined *the skull* and *the model of the sink*, and upon *this examination*, together with such *description* of the construction and condition of the sink as he had heard from other witnesses, we are of opinion it was competent for him to answer the question.

The question presented by the fifteenth exception is whether *an accessory before the fact, is competent to testify for the principal felon?* That he was not at Common Law, can no longer be considered an open question. Not a single case has been referred to by the counsel who has argued this case with a zeal so commendable and with an ability not less conspicuous, nor have we been able, after the most diligent examination to find one, in which such evidence has been admitted

The rule of exclusion resulted necessarily from the relation in which the parties stood to each other. "An accessory before the fact is one who not being present, yet counsels, incites and procures another to commit a felony." 1 *Chitty's Cr. Law,* 262 ; 1 *Hale,* 615.

The trial and conviction of the principal was therefore a condition precedent to the trial of the accessory, whereas the acquittal of the principal operated *ipso facto,* to discharge the accessory. To allow an accessory to testify under such circumstances, would be to permit him to testify for himself.

But, it is contended that whatever may have been the rule of the common law, an accessory is a competent witness for the principal under the Act of 1864, ch. 109.

Section 1st of that Act provides that, "No person offered as a witness shall hereafter be excluded by reason of incapacity from crime or interest from giving evidence either in person or by deposition," * * * .* * * * "except as hereinafter excepted."

Section 3. "No person who, in any criminal proceeding, is charged with the commission of an indictable

offense or any offense punishable on summary conviction, shall be competent or compellable to give evidence for or against himself, nor shall any person be compellable to answer any question tending to criminate himself," &c.

It is insisted that the common law ground of incapacity on the ground of interest is swept away by the first section, and that the exception in the 3d section excludes only a party on trial, called on his own behalf, and that the accessory and principal being in this case indicted and tried separately, the former is a competent witness for the latter.

This construction, however, is certainly not warranted by the language of the statute. The exception in the 3d section is not confined to the party on trial, but says in express terms,

"No person who, in any criminal proceeding is charged with the commission of an indictable offence," * * "shall be competent or compellable to give evidence for or against himself."

The question, then, as to whether the accessory in this case comes within the provisions of the 3d section, resolves itself into this, "is he charged in a criminal proceeding with the commission of an indictable offence, and if so, is the nature of the proceeding in which he was offered as a witness of such a character as he would be testifying for himself?" That the witness Hamilton Shew was charged in a *criminal proceeding* with the *commission* of an indictable offence is admitted, and it is equally clear that the nature of the proceeding in which he was offered as a witness, that is the trial of the principal, was of such a character, that he would be testifying for himself, because the acquittal of the party on trial, in whose behalf he was offered as a witness, operated *ipso facto*, as an acquittal of the witness.

The fact, that they were separately indicted does not, in any manner affect the principle upon which the testi-

mony of an accessory was excluded. If indicted *jointly*, they must be tried *separately*, the conviction of the principal being necessary to put the accessory on trial, and even in such a case, if the contention of the prisoner be correct, the accessory would be competent as a witness, because he would be testifying in a proceeding in which another party was charged with the commission of an indictable offence. An accessory was incompetent to testify for the principal at common law, not on the ground of being jointly indicted with him, for such was not always the case, but upon the ground that to permit him to testify under such circumstances, would be to allow him to testify for himself, and it was to prevent any possibility of its being thought that the law in this respect had been altered by the first section of the Act of 1864, that the third section was introduced.

The construction contended for by the prisoner is not sanctioned by any authority. The Act of 1864, chap. 109, was taken from the British statutes of 6 and 7 Vict., chap. 85, and 14 and 15 Vict., chap. 99—the third section of the latter statute being identical in language with the third section of our Act. In considering these statutes, Mr. Taylor, in the 5th edition of his work on Evidence, 2 vol., sec. 1223, says,

"If, therefore, several persons be jointly indicted, any one of them may under section 2 (which corresponds in this respect with the 1st section of the Act of 1864) be called as a witness, either for or against his co-defendants, excepting only in those few cases where the indictment is so framed as to give him a direct interest in obtaining their discharge. For instance, if a man were indicted for conspiracy or a riot with other defendants, or as an accessory to their guilt, * * * it would seem that he could not be a competent witness for them, or compellable to give evidence against them, because in each of these cases, * * * the acquittal of the other defendants

would inevitably lead to his own, while their conviction might, at least, be a material step in establishing his guilt.'' According to the construction thus placed upon the British Evidence Act, a witness was incompetent under it, to testify in any case where the acquittal of the prisoner would lead to his own, or where their conviction might be a material step in establishing his guilt—a construction utterly inconsistent with the one contended for by the prisoner.

In the late case of *The Queen vs. Payne and others*, 1 *Crown Cases Res.* 349 (*Law Reports*) the exception provided for in the 3d section of the 14 and 15 Vict., ch. 99, was held to extend farther than even laid down by Taylor. In that case four persons were jointly indicted for entering upon the land belonging to Earl Dudley, for the purpose of taking or destroying game, and upon the trial one of the *prisoners* was offered as a witness for the other. The case was heard before the *sixteen Judges* of England, constituting the Court of Appeals in criminal cases. It was pressed in argument in that case, as it was in this, that the common law ground of incapacity on account of interest had been abolished by the 1st and 2d sections of the British Statute, and that the only witness whose testimony was excluded by the 3d section, was the prisoner called *on his own behalf.*

COCKBURN, C. J., said: '' We are all of opinion that the evidence rejected was properly rejected. We are all agreed that the exception in 14 and 15 Vict., ch. 99, sec. 3, was introduced to prevent any possibility of its being thought that the law, as it had existed from the earliest times, was altered by the Act. By that law it was a distinguishing characteristic of our criminal system that a prisoner on his trial could neither be examined nor cross-examined. We think it is impossible to suppose that it could have been intended to change this rule by a mere sidewind by means of this exception.'' We have referred

to this decision for the purpose of showing that the English Judges have gone much further in extending the exceptions of the 3d section of their Statute, than is contended for here, and that even in a case where parties were jointly indicted, one could not testify for the other, although the acquittal of the party in whose behalf he was called to testify, operated in no manner to discharge the witness.

We rest our decision upon the plain language of the statute which declares, that "No person who in any criminal proceeding, is charged with the commission of an indictable offence," "shall be competent or compellable to give evidence for or against himself."

In the sixteenth exception, the witness, Harrison, testified that he saw the prisoner at Union Bridge, on the 5th April, at about a quarter past three in the afternoon. On cross-examination, the witness said he was at several places at Union Bridge, on that day, before he saw the prisoner, and amongst others, he was at the office of Joshua Sweitzer, and that Sweitzer looked at his watch and said it was then about 1 o'clock, P. M.

The State then called Joshua Sweitzer, who testified that the said Harrison was not at his office on the 5th of April, while he the witness was there; that he did not look at his watch, and say it was about 1 o'clock, as stated by Harrison; that he recollected distinctly he was absent on the 5th of April, from his office, from eight o'clock in the morning, until seven o'clock in the evening; that he returned to Union Bridge so late that evening, that he had not time to get his supper, before he had to go to a meeting of the building association, of which he was an officer, &c.

The prisoner then called Isaac Shriver, and proved by him, the general character of Harrison for truth and veracity; whereupon the State offered to prove by the same witness, the general good character of Sweitzer for

truth and veracity, to which the prisoner objected. Mere contradiction among witnesses furnishes no ground, as a general rule, for admitting general evidence as to their character; though if fraud or other improper conduct be imputed to any of them, such evidence will be received. *Annesley vs. Anglesea*, 17 *How. St. Trials*, 1348. The credit of a witness however, may be impeached by evidence assailing his character for veracity; or by proof of contradictory statements in regard to material facts; or by *disproving by other witnesses material facts stated by him* either in his direct or cross-examination. Here the purpose of the State was to *discredit* the witness Harrison, by disproving *material facts testified* to by him, and it was competent therefore, for the prisoner to sustain the witness by proof of his general character for veracity. Thus the credit of the two witnesses, Harrison and Sweitzer, was fairly put in issue, and it was equally competent for the State under such circumstances, to support the general character of Sweitzer for veracity. To permit the credit of the two witnesses to be put in issue, and then to deny to either side, the right of sustaining its witness by proof of general character for veracity, would be to deprive the jury of evidence necessary to the determination of the issue thus submitted to them. And where such evidence has been admitted in support of the witness on the one side, it would be manifestly unjust to deny the same right to the other. The rule laid down in 2 *Taylor's Ev.*, sec. 1327, is not inconsistent with these views. There the author is speaking of a witness whose general character for veracity has been impeached, and says, "the party calling him may re-establish his credit, by attacking the general character of the impeaching witnesses. How far this plan of recrimination may be carried at common law, is not yet determined; though in Courts of Equity," adds the author, "the practice is in conformity with the rule of

the civil law," which permitted the discrediting witness himself to be discredited by other witnesses, but no further.

The last exception was taken to the refusal of the Court to sign the bills of exceptions, containing all the evidence given in the cause as prepared and presented by the counsel of the prisoner.

It appears, that during the trial, the prisoner's counsel reserved several exceptions to rulings of the Court on questions of evidence, but no exceptions were formally prepared during the trial, but were prepared thereafter, and in preparing the same, the counsel for the prisoner inserted all the evidence given on the trial, according to the view of such counsel, and asked the Court to sign and seal said exceptions, stating at the time, that they deemed it important to the full presentation of the questions reserved, that all of said evidence should be incorporated in the exceptions. The Court, however, were of a different opinion, and thought it unnecessary to the full and fair presentation of the several exceptions reserved, that the record should be incumbered with all the evidence in the cause, and declined to sign the exceptions as presented by the counsel for the prisoner, and required the exceptions to be prepared in accordance with the 5th Rule prescribed by the Court of Appeals, at the same time informing the counsel on both sides, that any suggestions they might make in reference to the insertion of facts or evidence material to the exceptions would be gladly heard and considered, and the Court thereupon, in the presence of the counsel on both sides, proceeded to revise and re-model the said exceptions, so presented by the prisoner's counsel, so as to make the same conform to the said 5th Rule, and in lieu of the exceptions prepared by the counsel for the prisoner, did sign and seal the several exceptions in the form they now appear in the record. The 5th Rule prescribed by this

Davis vs. State.

Court, respecting appeals from Courts of law, provides "that bills of exceptions shall be so prepared, as only to present to the Court of Appeals, the rulings of the Court below upon some matter of law, and shall contain only such statements of facts as may be necessary to explain the bearing of the rulings upon the issues and questions involved." "And it shall be the duty of the Judges in the Courts below, to require exceptions to be prepared in accordance with this Rule."

We have had occasion heretofore, on a *petition filed* by the counsel for the prisoner, praying this Court to direct the Court below to send up all the evidence in the case, to consider the question presented by this exception; and then again upon an application for a *writ of diminution;* and then again *in the argument of the case* the prisoner's counsel were permitted to argue that the record did not contain all the evidence necessary to present fully the exceptions reserved, and that the rulings below ought to be reversed on that ground, and after the most careful examination of the record we are of opinion that it contains all the facts and evidence necessary to a full and fair presentation to this Court of the several exceptions reserved by the prisoner.

Being thus of opinion that no error was committed by the Court in any of the rulings relied on, they must be affirmed.

*Rulings affirmed*
*and cause remanded.*

(Decided 18th April, 1873.)

STEWART, J., delivered the following dissenting opinion:

As this is a capital case, and I do not concur in the judgment of a majority of the Court, it is due to my brethren, and all concerned, that I should in this form, record the extent of my dissent.

I shall therefore take the occasion, briefly, to state my conclusions as to the various bills of exceptions, but

shall not undertake an elaborate discussion of the grounds or reasons therefor,—or refer to authorities for their support.

In the first exception, no objection is taken to the testimony of Doctor Manakee, who was the physician who had examined the wounds of the deceased; and who was offered by the State as an expert; but the exception was as to the character of the testimony sought to be obtained from him by the State, as to the kind of instrument inflicting the wounds upon the deceased.

The witness was asked by the State, to "state to the jury, what kind of instrument could in your opinion have inflicted those wounds."

The prisoner's counsel objected; insisting as we understand, that it was incompetent to prove the possibility of certain instruments having inflicted the wounds, but that proof, to be admissible in regard to the instrument occasioning the death of the party, must be within the limits of probability.

The prisoner's counsel suggested that the proper enquiry was, "what kind of instrument would have been likely to inflict the wounds?"

It was competent for the State to prove the character of the wounds, and by what sort of an instrument inflicted, and if the jury could find from the probability, or possibility of any instrument inflicting the actual wounds, that the prisoner was the party beyond a reasonable doubt, that used the instrument inflicting the wounds, such fact was relevant and legitimate. The question was remotely connected with the ultimate fact to be proved, and unless the preliminary information sought, (whether in the one mode or the other, was not material,) was followed up by additional proof, the answer, whether founded on probability or possibility, could not benefit the State or injure the prisoner.

All enquiries relevant in any degree to the investigation of the main issue are legitimate, and I do not perceive upon what grounds the testimony proposed could be excluded from the jury.

Much latitude is allowed on cross-examination, but the question propounded to the witness by the prisoner's counsel in the second exception, if permitted to be answered, would have introduced inadmissible testimony to some extent at least,—the statement of the hook in question,—and the Court below very properly refused to allow the question.

The objection to the competency and proposed testimony of Dr. Herring referred to in the third exception, was properly overruled. It was competent for the State to prove the guilt of the prisoner by circumstantial testimony. The deceased might have been murdered, or his death the result of accident. It was incumbent on the State to establish the former theory, and to exclude and negative the possibility of any other reasonable hypothesis. If the death of the party was the result of accident, the State must fail, because utterly inconsistent with the theory of guilt. Any relevant testimony to prove the death was not occasioned by accident, was admissible.

In the fourth exception, Dr. Herring had testified for the State, that the wound on the back part of the skull, was on the occipital bone and involved the occipital protuberance. The prisoner's counsel in his cross-examination, asked him in substance, if the skull below the occipital protuberance, was liable to be fractured by accident.

The preface to the question, "leaving out of view the description of the wound, etc." did not render it an abstraction. The prisoner's counsel had the right, on the cross-examination of Doctor Herring, as an expert, introduced on the part of the State, to propound the question without reference to Dr. Manakee's testimony. I do not perceive upon what legal grounds, the State

could interpose objection; and in my judgment the Court erred, in not overruling the State's objection.

Unless some reason can be given for the exclusion of testimony, it ought to be admitted; and the fullest investigation allowed—such is the policy and reason of the law of evidence, in the administration of justice.

The prisoner's question, by his counsel, in the fifth exception, to the witness as an expert, would have been clearly unobjectionable if it had omitted the reference to the rules stated by judicial authority. The question was complex, and although the witness could give his own opinion, founded on information from all sources, the answer to the question as propounded would have left it uncertain, whether he was giving his own opinion or that of others, unsworn and incompetent, and therefore such question was inadmissible and properly ruled out.

I see no valid objection to the rulings in the sixth and seventh exceptions.

The eighth exception is disposed of in the review of the third exception.

The testimony of the expert, Doctor Billingslea, referred to in the ninth exception, ought not to have been received. He was required to give his opinion merely as an expert upon the state of facts, testified to by Doctor Manakee.

Doctor Manakee had been cross-examined by the prisoner's counsel, as they had the right to do, and his testimony as a witness, as the basis for the opinion of an expert, must be taken in its entirety. The testimony on cross-examination should be received and considered by the Court, quite as admissible as the evidence in chief. It is irregular to separate the one from the other. The witness heard but a part of his testimony as to the series of facts upon which he was to give his opinion as an expert. There was, therefore, no sufficient and legal data for his opinion, and his testimony ought to have been excluded. Any other rule, it seems to me, would lead to very irregular results.

The question propounded to the witness, Doctor Martin, introduced by the State, on his cross-examination by the prisoner's counsel, referred to in the tenth exception, was one not difficult of an answer, and the prisoner was entitled to have it answered.

It was conceded to be competent. The explanation of the witness, that the answer he gave, was his only answer, was totally insufficient, unless he had further stated, that he was unable to give any other answer—the decision of the Court that it was a proper answer, and no further answer should be given, deprived the prisoner of the benefit of testimony to which he was entitled, and there was error in this ruling of the Court.

The alleged admission of the State in the eleventh exception, did not meet the purposes sought by the prisoner's counsel in his question to the witness, and the objection of the State, notwithstanding, ought not to have been sustained. The clear object of the prisoner's counsel, was to have the inference drawn by the jury, from the absence of any proof on the part of the State, of blood-marks on the wall of the mill, or clothes of the prisoner, that none existed, inasmuch as Professor Tonry had been employed by the State to analyze the supposed blood-marks; and after having done so, found none, as there was no report from him. Such would probably be the conclusion of the jury, as conjectured by the prisoner's counsel. The alleged admission by the State, that the Professor had been employed, but had not applied any test directly, antagonized or excluded any such inference as sought by the prisoner's counsel.

There was no reasonable objection to the testimony of the expert referred to in the twelfth and thirteenth exceptions, as that evidence was based upon all the proof adduced.

The testimony of Dr. Scott, offered in the fourteenth exception, should have been ruled out, because based upon a partial knowledge of what the witness had sworn to.

He ought not, for the reason stated in the ninth exception, as to Doctor Billingslea's testimony, to have been allowed to give his opinion as an expert, without a proper foundation had been first laid.

The testimony of Shew, a witness offered by the prisoner in the fourteenth exception, should have been received. He was separately indicted as an accessory to the commission of the alleged murder, and although the record of the conviction of Davis, the principal, might have been used against him, if put on trial, yet anything he swore in this case, or that of any other witness, could not have been adduced on the trial of Shew, as accessory.

By no legal intendment could it follow, that by giving testimony in this case, he was testifying for himself, although his testimony might acquit the principal, Davis, who was entitled to his testimony, unless there is some legal point of objection.

But if, in fact and in law, Shew, when testifying for the prisoner, was giving evidence for himself, his testimony could not be excluded, on the ground, that he was giving such testimony; because by the 1st sec. of the Act of 1864, ch. 109, any interest he might have in the result of Davis' trial, could not affect his competency.

The exceptions recognized in the 1st section of that Act, have reference to litigants, or parties having a trial pending,—the 2d section, having reference to one description of litigants, those in civil causes, and the 3d section to criminal proceedings, where a person is charged with the commission of an indictable offence, &c. The exception of that section, is to a party on his own trial, and in such case, he is rendered incompetent to testify, where, otherwise under the 1st section he would labor under no disability, no matter how greatly and directly interested.

The object and policy of this law so radically changing the ancient rules of evidence, was to abrogate the restrictions upon testimony on the score of interest or crime,

recognized by the common law, and to admit the testimony of all witnesses, to be estimated for what it was worth under the circumstances of interest or crime; as a better means of eliciting truth, and advancing the purposes of substantial justice, than the principles and modes of the common law allowed.

It must be conceded, to give a fair construction to the provisions of this law of evidence, that every witness is clearly competent, unless within the exceptions, and should not be excluded by any rule of the common law, and only by virtue of the statutory disabilities.

If there were any doubt upon the subject, the rule of the statute should govern and not the exception. The prisoner is entitled to the benefit of all reasonable doubts in this case.

This new principle of evidence has been extended in some quarters, so as even to allow a party to testify in his own favor, when actually on trial. But the provisions of the law of this State must govern in this case.

There has been no decision of the British Courts, where they have a similar law to ours, or rather our Statute is very much a transcript of the English law upon the subject; nor has there been any judicial ruling anywhere, excluding the testimony of an accessory in the trial of his principal.

The case of *The Queen vs. Payne and others*, relied upon by the Attorney-General, settles nor affirms any such construction.

According to my best apprehension of the tenor of the Act of 1864, the very obvious construction of its provisions, admits the testimony of an accessory, and I think the prisoner was entitled to have the testimony of Shew, and that the Court below committed an error in his exclusion.

I refer to the very lucid opinion of my brother BOWIE, for a more satisfactory and detailed exposition of the reasons for this construction.

The objection of the prisoner's counsel to the testimony of the witness Shriver, referred to in the sixteenth exception, ought to have been sustained.

The State had permitted the prisoner to sustain his witness, Harrison, by Shriver, as if he had been impeached by the State's witness, Sweitzer, who, on the other hand had not been impeached, in fact, or by any concession of the prisoner, and therefore, the State had no right to undertake to sustain its witness, when not impeached. I know of no rule or practice, or authority to sustain the ruling of the Court below in this exception. The mere disagreement of witnesses in their testimony, is not an impeachment. See *Vernon vs. Tucker*, 30 *Md.*, 456.

I concur fully with the reasoning and conclusion of Judge BOWIE, upon this exception in his dissenting opinion.

There is some reasonable ground of objection on the part of the prisoner's counsel to the ruling in the seventeenth exception.

The counsel for the prisoner having reserved exceptions during the progress of the trial to the rulings of the Court, on portions of evidence, after the trial, prepared exceptions, in which all the evidence was embraced, according to their view of the same, and asked the Court to sign and seal the same, stating they deemed it important to the full presentation of the questions involved, that all the evidence should be incorporated.

The Court thought such course unnecessary, and declined to sign the exceptions thus prepared, but required them to be prepared in accordance with the 5th Rule prescribed by the Court of Appeals. 29 *Md.*, 2.

The Court thereupon revised the exceptions themselves, which had been framed by the counsel for the prisoner, and signed and sealed the exceptions thus revised in lieu of the exceptions of the prisoner's counsel.

The recent law, authorizing exceptions in criminal cases, applies the same rule, governing exceptions in civil cases, and the 5th Rule of the Court of Appeals referred to is applicable. That Rule ought to have a reasonable interpretation, to accomplish the purposes designed.

The object of the rule, together with the 6th and 7th Rules, was to prevent the insertion of useless matter, which had been done under the former practice, so as not to have the record encumbered with anything not necessary or material to the full and fair presentation of the question to be reviewed by the Appellate tribunal.

This rule ought to be carried into effect according to its spirit and intent, not merely that the record may be abridged as much as possible, but to subserve the purposes of substantial justice. To accomplish this, mere forms must yield to matters of substance. A large discretion is given to the Judges, who have the control in the preparation of bills of exceptions, and they are required to see that all the necessary facts are stated in the exceptions, to enable the Court of Appeals fully and fairly to comprehend the bearing of the rulings upon the question involved.

It is manifest that a very strict abridgment of the statement of the facts might hazard the proper presentation of the questions to be adjudicated. If a more full statement is made, and unnecessary matter incorporated, the surplusage would not vitiate the proceeding—under such circumstances, it seems to me in this criminal proceeding, involving the life of the prisoner, and more especially, where a very large portion of the testimony was that of experts, whose opinions were admitted as evidence; predicated upon facts testified to by others, the effort to abridge the statement of the evidence to accord with a rigid construction of the 5th Rule, and at the same time, to furnish the Appellate Court with full and adequate information for the review of the questions decided below,

was a very embarrassing duty, devolved upon the Court, and which might in the performance be attended with some injustice to the accused.

In such case, where the counsel of the prisoner, having charge of his interests, had prepared the exceptions embracing all the evidence and represented to the Court, that such course was deemed necessary, for the full presentation of the questions to this tribunal; in my judgment the purposes of justice between the State and the prisoner, would have been better subserved by giving to the Rule such operation as would admit of no question, rather than to have the statement of fact so abridged by a meagre presentation, as to afford ground of complaint, and possible disability in this Court, fully to determine the questions involved.

The statement of the evidence is reduced to a narrow compass, and I doubt if it is sufficently comprehensive to enable this Court, properly to review the rulings below, as to the admissibility of the testimony of the experts, whose opinions upon facts testified to by others, not embraced in the record, formed a large portion of the evidence.

A large discretion is of course to be allowed to the Court below; still in a case where the purposes of justice require a revision of their determination in such a proceeding, this Court, where the exception is taken, has the power of correction.

This Court, as well as the Legislature, has authority under the 18th sec. of the 4th Art. of the Constitution, to change or modify the Rule adopted, if it require revision to adapt it to the exigencies of criminal proceedings. But as it stands, I doubt not a reasonable construction of its provisions in their application to criminal cases, authorizes this Court to review the exercise of authority under it, given to the Court below in regard to this matter. According to my apprehension, the Court below erred in

its ruling, in this exception, disallowing all the evidence to be incorporated in the exceptions. Concurring with the majority of the Court on the first, second, third, fifth, sixth, seventh, eighth, twelfth and thirteenth exceptions, but being of opinion for the reasons stated, that there was error in the rulings of the Circuit Court in the fourth, ninth, tenth, eleventh, fourteenth, sixteenth, and seventeenth exceptions, I think the case ought to be remanded and a new trial ordered.

Bowie, J., delivered the following dissenting opinion.

Having heard the second argument of this cause only, and had but little leisure for the consideration of the numerous exceptions and examination of authorities, I very reluctantly dissent from the conclusions as to the fifteenth and sixteenth bills of exception, reached by the majority of the Court, who have had larger opportunities, and given the case more mature reflection.

Respect for the opinion of my brothers, as well as the importance of the principles involved, compels me to state, however imperfectly, the reasons upon which my dissent is founded.

The exclusion of testimony on the ground of interest in the event of the suit, or in the record, as an instrument of evidence, or on account of conviction for crime, being found by long experience, in the judgment of the most enlightened jurists of Great Britain, to defeat rather than promote the administration of justice, a series of enactments tending to relax the rigid rules of the Common Law, was initiated in the reign of William IV., (1833,) and culminated in that of Victoria, (1851;) in the Act known as Lord Brougham's Act, by which all incapacities from interest or crime, (except in a few specified cases,) were abolished.

No act of legislation, since the adoption of the Bill of Rights, has had more important influence on the administration of justice.

The preamble of Lord DENMAN's Act, 6 & 7 *Vict.* 1843, indicates the object and policy of the radical change in the law of evidence, in the following significant and emphatic terms. "Whereas *the inquiry after truth,* in Courts of justice, is often obstructed by incapacities created by the present law, and it is desirable that full information as to the facts in issue, both in criminal and civil cases, should be laid before the persons who are appointed to decide upon them, and that such persons should exercise their judgment *on the credit of the witnesses adduced,* and *on the truth of their testimony:*" Be it enacted that "No person offered as a witness shall hereafter be excluded by reason of incapacity from crime or interest from giving evidence, either in person, or by deposition, according to the practice of the Court, on the trial of any issue joined, etc., in any suit, action or proceeding, civil or criminal, etc., but that every person so offered, may and shall be admitted to give evidence, etc.; notwithstanding that such person may or shall have an interest in the matter in question, or in the event of the trial of any issue, matter, question or inquiry, or of the suit, action, or proceeding in which he is offered as a witness, and notwithstanding that such person offered as a witness, may have been previously convicted of any crime or offence: Provided this Act shall not render competent any party to any suit, named in the record," etc.

These provisos (says Taylor,) engrafted on the general rule, that no interested witness should be incompetent to give evidence, were "after the wisdom of this great alteration in the law had been tested and thoroughly proved by the experience of six years," swept away by Lord BROUGHAM's Act, 14 & 15 *Vict.,* "which carried out the principle to its legitimate extent."

Whatever individual opinions of their wisdom may be, it is manifest from their origin, and progressive advance-

ment by successive enactments to their present state, that the alterations in the law of evidence, were not the result of any temporary impulse, but the steady and gradual development of principles, directly opposed to the common law maxim, *"nemo debet esse testis in sua propria causa."* The advocates of the new system say the common law rule was founded upon ignorance and distrust of humanity; the supposed omnipotence of self-interest, and the narrowest view of evidence, as a science. On the other hand, the modern doctrine, that no exclusion shall exist from interest or crime, is based upon confidence in man; in the sagacity and discrimination of judges and jurors, and the self-evident proposition, that exclusion and inquiry after truth are irreconcilable.

The changes in the law of evidence, effected in English jurisprudence, by the statutes referred to, were, after an interval of twenty-five years, introduced into this State, by an amendment of the Code, by the Act of 1864, ch. 109: which, although not prefaced by any preamble, being as it is said, almost a literal transcript of the 14 and 15 of Victoria, may, from its purview, be regarded, as a legislative adoption of the theory of evidence therein embodied. The 1st section of the Act of 1864, ch. 109, enacts that "No person offered as a witness shall hereafter be excluded by reason of incapacity from crime or interest, from giving evidence, * * * * * * but that every person so offered may and shall be admitted to give evidence, notwithstanding that such person may or shall have an interest in the question, or in the event of the trial, * * * * *in which he is offered as a witness;* and not-withstanding that such person offered as a witness, may have been previously convicted of any crime or offence," (the crime of perjury excepted,) and the parties litigant, and all persons in whose behalf any suit, action or other proceeding may be brought or defended, *themselves,* and their wives and husbands, shall be competent, and

compellable, to give evidence in the same manner, as other witnesses," except as thereinafter excepted.

The 3d section enacts, "No person, who in any criminal proceeding, is charged with the commission of any indictable offence, or any offence punishable on summary conviction, shall *be competent,* or *compellable to give evidence for or against himself,* nor shall any person be compellable to answer any question *tending* to criminate himself, nor, in any criminal proceeding, shall any husband be competent or compellable to give evidence for or against his wife," etc.

The question is, how far does the third section qualify or restrain the language of the first. We are required now, for the first time in this State, to decide whether the Act of 1864, ch. 109, constituting the 1st and 3rd sections of the 37th Art. of the Code of Public General Laws, shall be *liberally* interpreted in consonance with its policy and spirit, or shall be *literally* construed, so as to contract its operation. The State contends that the third section incapacitates any person, who is charged in *any* criminal proceeding, with an indictable offence, from testifying *for another,* if that testimony tends to exonerate the witness, in any other case in which he is charged.

The appellant insists that the true meaning of the section is, he shall not testify for himself in the case in which he is charged; in all others he is a competent witness and compellable to testify. The rules for the interpretation of statutes, as laid down by the Barons of the Exchequer, in *Heydon's case,* (3 *Rep.* 7,) and sanctioned by universal consent since, are

"1st. What was the common law before the making of the Act?

"2d. What was the mischief and defect against which the common law did not provide?

"3d. What remedy the Parliament hath resolved and appointed to cure the disease of the Commonwealth? and,

"4th. The true reason of the remedy.

"It was there held to be the duty of Judges, at all times, to make such construction as should suppress the mischief, and advance the remedy ; putting down all subtle inventions and evasions for the continuance of the mischief, '*et pro privato commodo*,' and adding force and life to the cure and remedy, according to the true intent of the makers of the Act, '*pro bono publico.*'" *Dwarris on Stats.*, 695.

Interpreting the Code by these sound maxims, adopted by the sages of the law in their palmiest days, the meaning or intention of the Legislature is next to be sought in the language of the several sections cited.

The Common Law, as we have seen, excluded as witnesses all persons interested in the event of the suit, and all parties to the record, as well as persons convicted of crime.

Experience showed that these incapacities obstructed the search after truth and defeated the administration of justice.

The remedy designed was, the removal of these restrictions, and rendering all persons competent to testify, as far as compatible with other great principles of justice. The great impediments to full information as to the facts, in the trial of causes technically classified were "conviction for crime," "interest in the question or issue," and being "parties of record."

The first section of the Act of 1864, ch. 109, "*Ex vi termini*," absolutely removes incapacity from crime, or interest, in all cases civil or criminal, "notwithstanding such person shall have an interest in the matter in question," or in the event of the trial of any issue, or in any trial, in which he is offered as a witness, and notwithstanding he may have been previously convicted of any crime, perjury excepted.

In civil cases, all parties (when both the original parties to the cause of action are alive,) their husbands and wives,

are made competent, and compellable to testify for others, and may testify for themselves.

Thus, it may be said, with trivial exceptions, all objections to the competency of witnesses, for crime, or interest, are annulled in civil or criminal cases.

No conviction for crime, however infamous, (except perjury,) no interest, however controlling, excludes the witness ; so that, all the fountains of knowledge, whether pure or poisoned, all sources of information, are designed to be open to the judge or jury, before whom the trial is had. For whose benefit are the limits of investigation so extended, and the barriers of exclusion broken down?

For the protection of the rights of the parties and "*pro bono publico,*" not for the advantage of the witness, or "*privato commodo.*"

It should be borne in mind, that the terms of this Act of Assembly are negative, the strongest form of inhibition, viz : "No person, etc.," shall hereafter be excluded by reason of incapacity, etc. ; they are absolute, explicit, and peremptory, showing no discretion was intended to be given. *Dwarris on Statutes,* (715.) If, as we have seen, all incapacity from "conviction for crime," (except perjury,) and from "interest," is abolished by the 1st section of the Act of 1864, ch. 109, in both civil and criminal cases ; is it consistent with the established canons of construction to adopt a reading of the third section which renders the first inoperative in a large and most important class of cases, included within its letter and spirit ; when the third is susceptible of being gratified without violating the first. It is admitted in the brief of the Attorney-General, that the first section standing alone, is broad enough to include not only persons having an interest in the result of the issue, but parties to the record, severally or jointly charged, or indicted, and therefore the third section was enacted to qualify its meaning and except the latter class.

If he is correct in this view, the object and office of the third section ·was merely explanatory and saving, confining the alteration of the common law rules of evidence in criminal cases, to persons interested, or convicted of crime, not parties to the record, but retaining the disability of those who were parties of record.

This construction seems to us, not only consonant with the declared objects of the amendment of the law of evidence in Great Britian, but the spirit and letter of the two sections of the Act of 1864, above cited.

No verbal criticism can render the third section clearer than it is.   A person not indicted jointly, cannot be said to be charged with crime in a proceeding against another, however that prosecution may be related to some other proceeding against himself, and therefore, in testifying for another, is not testifying for himself.

The language of the third section is not, no person who is indicted, etc., shall be competent or compellable to give evidence for or against himself, but "No person who in any criminal proceeding is charged;" that is, "given in charge or put on trial." To be "charged," technically, is to be put on trial, and in this sense, it will appear from the language of commentators on the English statutes, hereinafter cited, to have been used.

As a remedial Act, designed to enlarge investigation and gather information from every source, to eviscerate the truth in vindication of life, liberty and property, it is entitled to a liberal construction.   It was one of its special objects to give persons accused, the benefit of the testimony of their supposed confederates.   In cases of accusation founded on circumstantial evidence, the necessity of this means of eliciting the facts is self-evident.

From the infinite complexity of human affairs, the innocent are often involved in the darkest shadows of suspicion, whilst the guilty assume the shape of angels of light.   The law, in its wisdom and mercy presumes all

men to be innocent until convicted in due course of law, to protect them from the effect of fallacious appearances. Men are judged by the company they keep. Associates are supposed to have common objects and purposes, and when one is charged with crime, his most intimate companion and friend is not unfrequently suspected, and prosecuted as his confederate or accessory. If according to the rule of the common law, the accessory cannot testify for the principal, or *vice versa*, until each has been tried and acquitted, the readiest and most natural means of defence is taken from the accused, and suspicion is equivalent to conviction.

How are the inferences of guilt from circumstantial evidence drawn by indignant virtue, talent, and zeal, against a prisoner charged with some revolting crime, to be dissipated, if the net which encloses the one, also, so entangles his associates, that they cannot depose in his favor?

In ancient times, the jurors taken "*de vicineto*," were the witnesses, or "*compurgatores*" of the accused. Now the jury are taken as far as possible from the neighborhood, and the less they know of the prisoner, the better they are qualified to decide his fate.

Conceding, that the testimony of confederates, and accessories, etc., is justly subject to great suspicion of being rendered under influences adverse to the truth, yet it is consistent with the modern theory of the science of evidence to admit, rather than exclude it.

It is urged on the part of the State, that as an accessory cannot be tried (except by his own consent) before the principal, and the acquittal of the latter, is a discharge of the former; the accessory has a direct interest in the record of the conviction or acquittal of the principal, and in testifying in behalf of his principal, he testifies directly in his own behalf and for his own interest; that the interest which at common law rendered a party incom-

petent as a witness, was tested not only by the fact, that he was actually a party to the record, and was then on trial, but where he was clearly interested in the result of the case, even though no party to the record, he was disqualified; and a party was interested in the result where the record could be used for any purpose for or against him; the record of the trial of the principal is *prima facie* evidence for or against the accessory; *ergo,* the accessory is so far interested in the result of the trial of the principal as to render him incompetent at common law. "*He is giving evidence for himself.*" The disqualification or incompetency of parties to the record, in criminal cases, to be witnesses at common law, was not founded upon interest in the record, as a means of evidence, but on the maxim of the common law, *that no man should be compelled to testify against himself:* therefore all traversers on trial were held incompetent. Interest in the record, as a means of evidence, was another and distinct ground of exception. The evidence amendment Acts in Great Britain and Maryland, clearly destroy the disqualification from interest, but still leave the parties to the record incompetent. It is therefore no argument against the admissibility of the accessory to say, he had an interest in the record as evidence, that ground of incompetency being expressly taken away by the text of the first section of the Acts above referred to.

It is said, if the accessory testify, he cannot be compelled to answer any question which would tend to criminate himself.

It is no anomaly in criminal proceedings to exempt a witness from answering questions which tend to criminate him. It is a privilege guaranteed to all witnesses, by the common law, and which was adopted, and declared as an inviolable principle of justice by the Bill of Rights. 1 *Green. Evid.*, 451; *Bill of Rights, sec.* 22. Taylor, the author of the *Act of* 14 *and* 15 *Vict.*, *ch.* 99, in his work on

Evidence (*4th edition, p.* 1145,) commenting on the proviso in the third section, declaring nothing therein contained, shall render any person competent or compellable to give evidence for or against himself, remarks : "By the general law of the land, every witness is protected from answering questions where the answers would tend either to criminate himself or expose him to any penalty, * * * and as the Act *simply makes parties witnesses,* it is obvious that without any special enactment, they might have claimed the same protection as all other persons under examination."

It is clearly deducible from the observations of the same writer, in his *6th edition, vol.* 2, *sec.* 1223, on the proviso of *sec.* 3, *of* 14 *and* 15 *Vict., ch.* 99, that he construed that section as applying only to parties on the record. His language is: "It has been seen that Lord BROUGHAM'S Act of 1851, *in making parties to the record admissible witnesses,* has expressly provided in sec. 3, that nothing in the Act shall render any person who in any criminal proceeding is charged with the commission of any indictable offence, or any offence punishable on summary conviction, competent or compellable to give evidence for or against himself or herself."

Now this proviso calls for three observations. In the first place, it does not say that the persons specified in it shall not be rendered by the Act competent or compellable to give evidence at all, but merely that they shall not be allowed or forced to testify *for or against themselves.*

In the event therefore, of several persons being jointly indicted, it would seem to be no unreasonable proposition to contend, that any one of them might, under section 2, be called as a witness either for or against his co-defendants, excepting only in those few cases, where the indictment was so framed, as to give him a direct interest in obtaining their discharge. Indeed, for some years, this was considered to be the law by many Judges, though

some doubted, and at last, in 1872, on the point being reserved for the Court of Criminal Appeal, that Court, after much discussion, decided that Lord BROUGHAM's Act was not intended to alter, and did not in fact alter the ancient law of England, which prohibited any attempt to examine or cross-examine *any prisoner on his trial;* referring to *Reg. vs. Payne,* 41, *L. J.*

This case is referred to by the Attorney-General, to sustain his construction of the third section of the Act of 1864, viz: that "no one *charged* with an indictable offence" can be either "examined or cross-examined in any case where he is interested, and it is wholly immaterial, whether such interest arise from a direct interest in the result of the case, or by being a party to the record." He says: "The Maryland statute seems to be copied from the British Evidence Act, and the force and effect of the third section has received a judicial interpretation by the sixteen Judges sitting as a Court of Criminal Appeals, as late as January 1872, in the case of *The Queen vs. Payne, etc.* In that case it was expressly declared that the exception in 14 *and* 15 *Vict., ch.* 99, *sec.* 3, was introduced to *prevent any possibility* of its being thought that the law as it had existed from the earliest times, was altered by the Act."

I have no disposition to deny the great moral weight which the united legal judgment of the eminent jurists of England should have in a case parallel with that now before us.

But although the law they were interpreting was essentially the same, the facts to which it was applied were entirely different, and the language used by them, to be correctly understood, must be taken in connection with the facts, circumstances and relation of the parties to the record.

The declaration, that the 3d section of *Vict.* "was introduced to prevent any possibility of its being thought

that the law as it had existed from the earliest times was altered by the Act," was necessarily limited to the case of parties to the record, (the case then before them) and qualified by other expressions, showing that "parties charged" in their view, were those "given in charge to the jury" or on trial, as a more particular statement of the case will show.

In *Reg. vs. Payne*, the prisoner Payne and three others, (including one Curtis, the proposed witness,) were jointly indicted for poaching. On the trial all four prisoners were sworn to by various witnesses, as having formed part of the gang of poachers; the defence was an *alibi*, and the counsel for Payne, proposed to call Curtis, to prove the *alibi*. The Judge held he was incompetent. The prisoners were convicted and the questions reserved for the opinion of the Court were,

1st. Whether a prisoner jointly indicted with another, can, *after they have been given in charge to the jury*, be called as a witness for the other, without having been either acquitted or convicted, or a *nolle prosequi* entered?

2d. Whether upon the present form of indictment, and under the circumstances of the case, the prisoner Curtis was competent, and ought to have been called as a witness for the prisoner Payne?

The opinion of the Court was announced by Cockburn, C. J., in the following concise and explicit terms:

"We are all of opinion that the evidence rejected, was properly rejected. We are all agreed that the exception in 14 *and* 15 *Vict., ch.* 99, *sec.* 3, was introduced to prevent any possibility of its being thought that the law as it had existed from the earliest times was altered by the Act. By that law, it was a distinguishing characteristic of our criminal system, that a prisoner on his trial, could neither be examined nor cross-examined. We think it impossible to suppose that it could have been intended to change this rule by a mere side-wind by means of this exception."

It is thus proclaimed by the highest judicial authority in England, that sec. 3d of 14 and 15 Vict. which corresponds in terms with sec. 3d of 1864, ch. 109, was intended to prevent the impression, that the Evidence Amendment Acts, changed the common law in its distinguishing characteristic, "that a prisoner on his trial could neither be examined nor cross-examined;" in other words, that it applied to parties on the record, alone.

The fifteenth bill of exceptions shows, that the appellant offered to prove by J. Hamilton Shew, facts tending to establish an *alibi*; the State objected to the competency of Shew to testify *in behalf of the prisoner*, and in support of its objection, produced and relied on the transcript of the record of an indictment by the Grand Jury of Carroll county, charging Shew as an accessory before the fact, of the prisoner, which indictment was still pending and undetermined; whereupon, the Court sustained the objection and refused to permit said Shew to testify, to which ruling the prisoner excepted.

Shew was not jointly indicted with Davis, was not convicted of the crime of perjury, was not subject to any objection (in my opinion,) affecting his competency, but stood in the position of one interested in the event of the trial, an objection going to his credit alone.

The prisoner was entitled to the benefit of his testimony however clouded with suspicion; the letter and spirit of the Act of 1864, in my judgment, rendering such persons competent and compellable to testify.

The object of the amendment in the law of evidence, was to make parties in interest, witnesses, and not interested witnesses, parties. For these reasons I think, the Court below erred in excluding the testimony of Shew.

The sixteenth exception presents the very common occurrence of a witness being cross-examined, and afterwards impeached by a contradictory statement of another

witness, as to the facts which he first detailed in his cross-examination.

The traverser's witness being thus contradicted, he called another to prove that the general character of the first for truth and veracity was good. Whereupon the State offered to prove by the same witness, that the character of the impeaching witness for truth and veracity was good also, to the admission of which the traverser objected, but the Court overruled the objection and admitted the same.

In my opinion, the endorsement of the traverser's witness, was no imputation on the character of the State's; the tendency of such testimony was to multiply collateral issues, to put the witnesses on trial, rather than the accused, and according to the principles laid down in the text-books as I understand them, there was no foundation for introducing the supporting testimony on the part of the State.